Argued and submitted June 9, 2003, judgment modified in part and remanded in part, otherwise affirmed on appeal; affirmed on cross-appeal July 21, 2004

In the Matter of the Marriage of

Nanci Sue GIBBONS,
*Appellant - Cross-Respondent,*

*and*

Roy Lynn GIBBONS,
*Respondent - Cross-Appellant.*

00DO 1913 DS; A117837

94 P3d 879

Sharon Lee Schwartz argued the cause and filed the briefs for appellant - cross-respondent.

James C. Farrell argued the cause and filed the brief for respondent - cross-appellant.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Wife appeals from a dissolution judgment. She contends that the trial court erred in its division of the parties' property and in its award of spousal and child support. Husband cross-appeals, assigning error to the property division on the ground that the court erred in its finding that husband had failed to rebut the statutory presumption that wife had contributed equally to the acquisition of 30 shares of stock in a closely held corporation. Our review is *de novo*. ORS 19.415(3) (2001).[1] We modify the dissolution judgment to require husband to pay wife an equalizing judgment for the value of her interest in two marital assets and otherwise affirm on appeal and cross-appeal.

The parties married in September 1984, shortly after they graduated from high school, and separated in September 2000. They have three children, two teenage daughters and a younger son. Wife was the children's primary caregiver, and husband often worked long hours during the marriage. Although wife held a few jobs during that time, she spent most of her time as a homemaker. Wife was unemployed at the time of trial. By agreement, the court awarded custody of the children to husband.

Husband works for his family's logging corporation, Allen & Gibbons Logging, Inc. He has worked there since high school. His current salary is approximately $60,000 a year. It is unlikely that husband's salary will increase in the

---

[1] The legislature amended ORS 19.415(3) in 2003. Or Laws 2003, ch 576, § 88 ("Upon an appeal from a [*decree*] **judgment** in a **case that constituted a** suit in equity **under common law**, the Court of Appeals shall try the cause anew upon the record." (Additions in boldface; deletions italicized in brackets.)). We need not decide whether the 2003 amendments to ORS 19.415(3) affect our standard of review because those amendments apply to the appeal of judgments that were entered on or after January 1, 2004. *See* Or Laws 2003, ch 576, § 90a ("The amendments to ORS * * * 19.415 * * * by sections 85 to 89 of this 2003 Act apply only to the appeal of judgments entered on or after the effective date of this 2003 Act. Any appeal of a judgment entered before the effective date of this 2003 Act shall continue to be governed by the law in effect on the day immediately preceding the effective date of this 2003 Act."). Based on the plain meaning of the text of Oregon Laws 2003, chapter 576, section 90a, we apply the 2001 version of ORS 19.415(3) in this case. *But see Kunze and Kunze,* 337 Or 122, 124, 92 P3d 100 (2004) (apparently citing the current version of ORS 19.415(3) in addressing a judgment that was entered before January 1, 2004).

near future. At the time of trial, husband owned 102.23 shares of Allen & Gibbons stock. Husband received 30 of those shares from his father between 1995 and 1997. Husband's mother gave husband a total of eight more shares in 1999 and 2000. Husband received the balance of the shares from his father's estate in April 2000. As a condition of husband's inheritance, he entered into a stock transfer agreement that permanently assigned his voting rights in the stock to the company's president and also gave the company the right to purchase the stock at favorable terms if he decided to sell it. Wife challenges the trial court's division of the parties' assets. The disputed assets consist of Allen & Gibbons stock, an interest in the Lawrence Gibbons Family Partnership, and the parties' home.

Both parties presented competing evidence on the value of the Allen & Gibbons stock. The court found that husband's expert was more convincing and, based on the expert's evaluation, determined the value of the stock to be $684.73 a share. The parties agree that the value of the partnership interest is $24,281. The court valued the parties' home at $270,000. It estimated that, if the house sold for that amount, the parties would receive $70,000 in proceeds after they paid the balance of their mortgage. The court ordered that the proceeds from the sale, if any, be applied in the following order:

"(a)  To pay the costs of the sale including the realtor commission, engineering study, and installation of city water;

"(b)  Marital obligations existing as of the date of separation;

"(c)  To reimburse Husband $300 for each month since October 1, 2000 he has occupied the residence and has been responsible for making the mortgage payment;

"(d)  Wife is to receive the $10,270.95 that represents her interest in the corporate stock;

"(e)  Wife is to receive the $12,140.50 that represents her interest in the Lawrence Gibbons Family Partnership;

"(f)  The balance is to be split equally."

Not including the mortgage, the parties had marital debt of $32,276.54 at the time of their separation. After payment of

that debt and the costs of sale, and reimbursment of husband for his post-separation mortgage payments, it is likely that, if the trial court's estimation of proceeds is correct, $30,000 or less will remain to pay items (d), (e), and (f).

The court awarded wife transitional spousal support of $1,000 per month for five years and $500 per month for the next two years. The court also ordered wife to pay husband $471 per month in child support. The court found that wife has the skills to be successful at a job if she pursues additional education and, for purposes of both support awards, it attributed a full-time minimum wage income to wife.

■ Wife first argues that the trial court erred in valuing the Allen & Gibbons stock at $684.73 per share because husband's expert's valuation of the stock, which the court adopted, was not based on a proper valuation method. Wife and husband agree that the shares, if held as a controlling interest with voting power, are worth $3,100 per share. Both agree that the value of the stock must be discounted from that value because the stock represents a 20.45 percent, non-controlling interest in the company. The parties disagree over the appropriate rate of the minority discount and whether the stock must be discounted further because of the stock transfer agreement. Wife contends that husband's expert over-discounted the value of husband's shares and that, properly discounted for the minority interest only, the stock's value is approximately $2,400 per share rather than $684.73. Wife's expert testified that the stock was worth approximately $2,400 per share based on an asset method of evaluation after a minority discount. Husband's expert did not conclude that specific discounts for minority and lack of marketability were appropriate but estimated that the economic rights attached to husband's shares were in the range of $60,000 to $75,000.

The court analyzed the competing testimony between husband and wife's experts as follows:

"Wife's expert, Brock Parthemer, testified that the fair market value per share was $2,404 based upon an asset approach of evaluating the corporation. Mr. Parthemer acknowledged that the stock transfer agreement, if binding,

would determine value, but indicated that the stock transfer value did not reflect fair market value. Husband's expert, Charles Chappel, did not conduct a separate evaluation of the corporation; nevertheless, he critiqued the Parthemer study and criticized Mr. Parthemer's reliance on the asset evaluation method. Mr. Chappel suggested that the asset approach was not workable because husband owns a minority interest in the corporation and has executed an irrevocable voting proxy; therefore, husband has no access to the corporate assets. Instead, Mr. Chappel indicated that the proper assessment of Husband's interest would be to consider the economic rights that the purchaser of his stock would acquire—specifically, the value of the cash flow resulting from an application of the terms of the stock transfer agreement together with the value of a possible future liquidation of the corporation. Mr. Sam Barker, an expert in the field, found that the cash flow in question had a fair market value ranging from $39,000 to $52,000, less costs and fees between $3,000 and $4,000. Given Mr. Barker's evaluation, Mr. Chappel's estimate of the value of the economic rights acquired by a purchaser of husband's stock under the stock transfer agreement was from $6[0],000-$75,000. The Court finds Mr. Chappel's analysis to be the more convincing because it addresses the economic realities of husband's position; therefore, the Court finds the value of husband's 102.23 shares to be $70,000, and at $684.73 per share, wife's interest is $10,270.95."

Wife argues that the trial court should have ignored the stock transfer agreement when it assigned a value to the stock, citing *Reiling and Reiling,* 66 Or App 284, 673 P2d 1360 (1983), *rev den,* 296 Or 536 (1984), and *Phillipakis and Phillipakis,* 14 Or App 377, 513 P2d 529 (1973). In both of those cases, we concluded that the relevant stockholder agreements did not affect the value of the stock. In *Reiling,* we concluded that the purpose of a corporate resolution that placed a value on the corporation was not, as the trial court concluded, to value the corporate stock but to effect a corporate dissolution and, therefore, that the resolution had no determinative effect on the stock's value. 66 Or App at 290-91. *Phillipakis* involved a buy-sell agreement that "did not contain any obligation on either party to purchase at" the price stated in the agreement. 14 Or App at 379-80.

■     Here, in contrast, the Allen & Gibbons stock transfer agreement values the corporate stock on a yearly basis and allows the corporation to purchase the stock at the designated value if a shareholder attempts to sell the shareholder's stock. The transfer agreement also provides that the company can purchase the stock on favorable terms: one percent down with the unsecured balance payable over a 25-year period at an interest rate equal to the London InterBank Offered Rate on the day that the sale closes. The agreement also deprives husband's shares of all voting power and any possibility that husband could orchestrate a liquidation of the company with other minority shareholders to reach the assets of the company. The trial court found that, based on those factors, the value of the economic rights acquired under the stock transfer agreement was $70,000 and that the value of husband's stock was therefore $684.73 per share. "In determining the fair market value of an interest in a closely held corporation, our inquiry focuses on the price that the hypothetical willing buyer would pay the hypothetical willing seller." *Tofte and Tofte,* 134 Or App 449, 457, 895 P2d 1387 (1995). On balance, we conclude that, given the stock transfer agreement and the fact that the stock represents a minority interest in the company, the trial court did not err in setting the value of the shares at $684.73 per share. We are persuaded that that is the price that a hypothetical willing buyer would likely pay for husband's stock given the combination of the minority interest and the restrictions in the stock transfer agreement.

■     In addition to her argument about the value of the Allen & Gibbons stock, wife argues that she should receive a larger share of the parties' marital property. Husband argues, in turn, in his cross-appeal that the court erred in failing to exclude all of the Allen & Gibbons stock in its allocation of property between the parties.

■    . Marital assets are "real or personal property, or both, that either of the parties, or both of them, acquired during the marriage." *Kunze and Kunze,* 181 Or App 606, 615, 47 P3d 489 (2002), *aff'd as modified,* 337 Or 122, 92 P3d 100 (2004). Because husband acquired all of his Allen & Gibbons stock during the marriage, the stock is a marital asset. Under

ORS 107.105(1)(f), there is a rebuttable presumption that both spouses have contributed equally to the acquisition of marital assets. *Kunze,* 181 Or App at 616.

> "The presumption of equal contribution to the acquisition of property during the marriage may be overcome by a finding that the property was acquired by one spouse uninfluenced directly or indirectly by the other spouse, *i.e.*, the other spouse has contributed neither economically nor otherwise to the acquisition of the property in issue."

*Stice and Stice,* 308 Or 316, 325-26, 779 P2d 1020 (1989) (citations omitted).

At trial, husband presented evidence in an effort to overcome the presumption that wife had contributed equally to the acquisition of the Allen & Gibbons stock. The court found that husband had failed to overcome the presumption of equal contribution with regard to the 30 shares of Allen & Gibbons stock that he acquired between 1995 and 1997. The court explained, "[D]uring most of this period, Wife was the primary parent and homemaker, thereby providing Husband the opportunity to work long hours in the family enterprise." The court also found, however, that husband had rebutted the presumption of equal contribution for husband's acquisition of the remaining shares that he received in 1999 and 2000. In the court's view, by 1999 "the relationship between Husband and Wife was so dysfunctional that there was clearly no contribution by Wife to the acquisition of this stock[.]" We agree with those findings and reject without further discussion husband's argument that he had rebutted the presumption of equal contribution with regard to his acquisition of the first 30 shares of his shares of Allen & Gibbons stock.

■ The court awarded all of the Allen & Gibbons stock and the parties' interest in the Gibbons family partnership to husband. It determined that wife had contributed equally to the acquisition of the parties' interest in the family partnership, the first 30 shares of Allen & Gibbons stock, and the family residence. It further concluded that a just and equitable distribution of the marital assets would give each party half the value of those assets. The court valued the 30 shares of Allen & Gibbons stock at $20,541.90 and the interest in the

Lawrence Gibbons Family Partnership at $24,281.00. It determined, however, that wife would receive the value of her share of those assets, or $22,411.45, from the proceeds of the marital home, which is another marital asset. The effect of doing that is to give wife less than half the value of the three assets.[2]

■     Our task on *de novo* review is to ensure that the division of marital assets is "just and proper in all the circumstances." ORS 107.105. Generally, a just and proper distribution of assets under ORS 107.105 is one that equally divides the marital assets between the parties. *Drews and Drews,* 153 Or App 126, 131, 956 P2d 246 (1998). On appeal, we will not modify a property division unless we conclude that a different division is significantly preferable. *Kunze,* 337 Or at 136; *Bidwell and Bidwell,* 170 Or App 239, 242, 12 P3d 76 (2000), *adh'd to on recons,* 172 Or App 292, 18 P3d 465, *rev den,* 332 Or 305 (2001).

On balance, we conclude that a property division that equally divides the assets to which both parties contributed during the marriage is significantly preferable to the trial court's distribution. We therefore modify the trial court's judgment to delete the provision that pays wife the value of her interest in the stock and partnership from the proceeds of the sale of the parties' home and to replace it with an award to wife of an equalizing judgment of $22,411.45. With those modifications, the parties will share equally in the value of the three assets to which both contributed during the marriage. We remand the case to the trial court to allow it to determine an appropriate payment schedule, security, and interest rate.

■     Wife also assigns error to the trial court's award of spousal and child support. Under the court's award, wife is to receive $1,000 per month in transitional spousal support from husband for five years and $500 per month for the next

---

[2] Using a joint asset to pay wife her share of the other marital assets reduces the amount that she receives from the assets and increases the amount that husband receives. For example, if the net equity in the family home is $30,000, the total value of the marital assets to be divided between husband and wife is $74,822.90. Under the court's distribution, wife would receive $26,205.72 from the marital assets to which she contributed equally with husband and husband would receive $48,617.17 from those assets, which is a decidedly unequal distribution.

two years and is to pay husband $471 in child support per month. Wife argues that the court erred because the award will not allow her to pursue her educational goals and does not allow her to live a lifestyle commensurate with the one that the parties enjoyed during the marriage. The parties agree that husband makes $5,000 per month and that wife was unemployed at the time of trial. Wife argues that she should receive spousal support of $2,500 per month. In the alternative, she argues that she should not be required to pay child support.

The trial court considered wife's potential income when it determined the spousal and child support awards. In calculating child support, there is a rebuttable presumption that an unemployed parent can work full time at a job that pays the minimum wage. OAR 137-050-0360. Wife contends that the court erred in assigning a full-time minimum wage income to her for purposes of its child support calculation because wife plans to take community college courses and then to attend a university. According to wife, her school plans rebut the presumption of OAR 137-050-0360. However, wife testified at trial that she did not plan to start school for two years; therefore, she did not rebut the presumption that she could work full time at a minimum wage job. We therefore reject wife's assignment of error regarding the child support award.

■ Wife also assigns error to the amount of transitional spousal support that the court awarded. Transitional spousal support may be awarded "[a]s needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein." ORS 107.105(1)(d)(A). The parties do not dispute that wife has met that threshold requirement for an award of transitional spousal support. *See Austin and Austin*, 191 Or App 307, 314, 82 P3d 170 (2003) (addressing threshold showing for compensatory spousal support under ORS 107.105(1)(d)(B)). Accordingly, we consider only whether the amount of the award of transitional spousal support was "just and equitable," ORS 107.105(1)(d), and supported by the statutory factors outlined in ORS 107.105(1)(d)(A). In light of those factors, particularly the financial needs and

resources of the parties and husband's custodial and associated financial responsibilities, we conclude that the trial court's award of transitional spousal support was proper. We therefore affirm that award.

On appeal, judgment modified by deleting provision that pays wife value of her interest in Allen & Gibbons stock and Gibbons family partnership from proceeds of the sale of parties' home and by adding provision awarding wife an equalizing judgment of $22,411.45; remanded to determine appropriate payment schedule, security, and interest rate for equalizing judgment; otherwise affirmed. Affirmed on cross-appeal.